ENVIRO EXPRESS, INC. *v.* AIU
INSURANCE COMPANY
(SC 17504)

Borden, Norcott, Palmer, Vertefeuille and Zarella, Js.

---

Argued May 15—officially released July 25, 2006

*Edward F. Beane*, pro hac vice, with whom was *Timothy F. Butler*, for the appellant (plaintiff).

*Lawrence Klein*, pro hac vice, with whom was *Amber Branciforte*, for the appellee (defendant).

NORCOTT, J. The sole issue in this case, which comes to us upon our acceptance of a certified question from the United States District Court for the District of Connecticut pursuant to General Statutes § 51-199b (d),[1] is whether a payment made to an injured third party pursuant to an uninsured motorist policy should be treated as one that the tortfeasor was legally obligated to make, and counted toward the retained limit[2] in the tortfeasor's umbrella insurance policy.[3] We answer that question in the affirmative.

The record certified by the federal District Court reveals the following facts and procedural background. The plaintiff, Enviro Express, Inc., is a waste hauler and transfer station operator doing business within the state of Connecticut. The defendant, AIU Insurance Company, contracted to provide the plaintiff with an umbrella insurance policy (policy) for amounts that the plaintiff "[became] legally obligated to pay by reason of liability imposed by law" in excess of its $1,000,000 primary insurance policy.

---

[1] General Statutes § 51-199b (d) provides: "The Supreme Court may answer a question of law certified to it by a court of the United States or by the highest court of another state or of a tribe, if the answer may be determinative of an issue in pending litigation in the certifying court and if there is no controlling appellate decision, constitutional provision or statute of this state."

[2] As an umbrella policy provider, rather than a primary insurer, the defendant, AIU Insurance Company, agreed to indemnify the plaintiff, Enviro Express, Inc., for damages in excess of "[t]he total of the applicable limits of the underlying policies listed in the [s]chedule of [u]nderlying [i]nsurance and the applicable limits of any other underlying insurance providing coverage to the [plaintiff] . . . ."

[3] Specifically, the United States District Court certified the following question to this court: "Is an uninsured or underinsured motorist payment considered a payment that the tortfeasor was legally obligated to pay for the purpose of determining whether the retained limit of the tortfeasor's excess insurance policy has been met?"

In June, 1998, a tractor trailer belonging to the plaintiff was involved in an automobile accident with a car driven by Louis Mennillo. Mennillo sustained severe injuries in the accident and brought an action against the plaintiff in the Superior Court. The plaintiff's primary insurer, Reliance National Indemnity Company (Reliance), which insured the plaintiff for up to $1,000,000 per accident, was declared insolvent by a court of competent jurisdiction and liquidated shortly thereafter. Mennillo subsequently received $600,000 in uninsured motorist benefits from his insurance provider, Safeco Insurance Company (Safeco).[4] The plaintiff and the defendant then settled the action brought by Mennillo for $2,000,000, in addition to the $600,000 that he already had received in uninsured motorist compensation, for a total compensation to Mennillo of $2,600,000.[5]

Thereafter, a dispute arose between the plaintiff and the defendant as to the effect of Mennillo's uninsured motorist recovery on their respective obligations under the policy. The defendant contends that Mennillo's $600,000 uninsured motorist recovery does not affect the plaintiff's obligation to pay the first $1,000,000 of Mennillo's damages before its umbrella obligations are triggered because of language in the policy relating to when insurance coverage is due. In the plaintiff's view, the $600,000 in uninsured motorist coverage counts toward the $1,000,000 retained limit, and it is responsible for paying only $400,000 of Mennillo's damages.

[4] The plaintiff also sought to recover from the Connecticut Insurance Guaranty Association (association). The association determined, however, that the $299,000 that would have been available was entirely offset by the $600,000 uninsured motorist payment, and denied the plaintiff's claim.

[5] Although it was not mentioned in the federal District Court's certified statement of facts, the parties agreed at oral argument before this court that Mennillo's claim had been settled for $2,000,000 over and above his uninsured motorist recovery.

The plaintiff subsequently brought this action in the Superior Court for the judicial district of Fairfield seeking a declaratory judgment that the $600,000 received by Mennillo was properly applied toward the underlying $1,000,000 retained limit under the policy. The defendant removed the action to the federal District Court pursuant to 28 U.S.C. § 1441 (a), which took jurisdiction over the case based upon diversity of citizenship pursuant to 28 U.S.C. § 1332.

The defendant subsequently moved for judgment on the pleadings pursuant to rule 12 (c) of the Federal Rules of Civil Procedure,[6] on the ground that the coverage clause mandated that the plaintiff pay $1,000,000 out-of-pocket before it was required to reimburse the plaintiff for the remainder of Mennillo's damages. The federal District Court, Underhill, J., noted that no state court had yet "examined how uninsured motorist payments should be treated when the question is whether they count towards a retained limit necessary to trigger the tortfeasor's excess insurance coverage," and determined that resolution of the certified issue required an evaluation of the relevant public policy implications.

---

[6] Rule 12 (c) of the Federal Rules of Civil Procedure provides: "After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings. If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56."

"[J]udgment on the pleadings is appropriate where material facts are undisputed and where a judgment on the merits is possible merely by considering the contents of the pleadings. . . . In ruling on such a motion, the trial court must accept as true all of the nonmovant's well-pleaded factual allegations . . . and draw all reasonable inferences therefrom in his favor. . . . Finally, the court may not grant [the] defendant's [r]ule 12 (c) motion unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." (Citations omitted; internal quotation marks omitted.) *DeSantis* v. *United States*, 783 F. Sup. 165, 168 (S.D.N.Y. 1992).

Accordingly, because "there is no controlling appellate decision, constitutional provision or statute of this state"; General Statutes § 51-199b (d); the federal District Court reserved judgment and certified to this court the question of how to interpret the provision of the insurance agreement that obligated the defendant to "pay on behalf of the [plaintiff] those sums in excess of the [$1,000,000] [r]etained [l]imit that the [plaintiff] becomes legally obligated to pay by reason of liability imposed by law," in light of the public policy considerations surrounding uninsured motorist coverage. See also footnote 2 of this opinion.

"We begin our analysis with the general principles governing the construction of insurance policies. An insurance policy is to be interpreted by the same general rules that govern the construction of any written contract and enforced in accordance with the real intent of the parties as expressed in the language employed in the policy. . . . The policy words must be accorded their natural and ordinary meaning. . . . Under well established rules of construction, any ambiguity in the terms of an insurance policy must be construed in favor of the insured because the insurance company drafted the policy. . . . This rule of construction may not be applied, however, unless the policy terms are indeed ambiguous." (Internal quotation marks omitted.) *Pacific Indemnity Ins. Co.* v. *Aetna Casualty & Surety Co.*, 240 Conn. 26, 29–30, 688 A.2d 319 (1997).

"[A] contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself. . . . The contract must be viewed in its entirety, with each provision read in light of the other provisions . . . and every provision must be given effect if it is possible to do so. . . . If the language of the contract is susceptible to more than one reasonable interpretation, the contract is ambiguous." (Internal quotation marks omitted.) *Cantonbury Heights Condominium Assn.,*

*Inc.* v. *Local Land Development, LLC*, 273 Conn. 724, 735, 873 A.2d 898 (2005). The fact that the parties interpret the terms of a contract differently, however, does not render those terms ambiguous. *Pacific Indemnity Ins. Co.* v. *Aetna Casualty & Surety Co.*, supra, 240 Conn. 30. Rather, whether a contract is ambiguous is a question of law for the court. Id. Accordingly, we turn first to the language of the policy.

When read in isolation, the coverage clause appears to support the defendant's position that it becomes obligated to pay only after the plaintiff has paid $1,000,000 in damages. It fails, however, to do so when read in light of the entire policy. The coverage clause, which provides in relevant part that "[the defendant] will pay on behalf of the [plaintiff] those sums in excess of the [r]etained [l]imit that the [plaintiff] becomes legally obligated to pay by reason of liability imposed by law," appears at the beginning of the policy under the general heading "[c]overage," and *not* in the portion of the policy specifically addressing the retained limit. Furthermore, based on its broad language, the clause's purpose seems to be to classify the policy as one of liability rather than indemnity,[7] not to confine the defendant's obligation to repaying only those damages actually paid by the plaintiff.

The coverage clause must be read in light of the retained limit clause, which provides in its entirety: "[The defendant] will be liable only for that portion of

---

[7] "We have [previously] explained the main difference between a liability policy and an indemnity policy: Whether an insurance contract is a liability policy or an indemnity policy depends upon the intention of the parties, as evidenced by the phraseology of their agreement . . . . The chief difference between a liability policy and an indemnity policy is that under the former a cause of action accrues when the liability attaches, while under the latter there is no cause of action until the liability has been discharged, as by payment of the judgment by the insured." (Internal quotation marks omitted.) *Black* v. *Goodwin, Loomis & Britton, Inc.*, 239 Conn. 144, 155–56, 681 A.2d 293 (1996).

damages in excess of the [plaintiff's] [r]etained [l]imit which is defined as the greater of either: 1. *The total of the applicable limits* of the underlying policies listed in the [s]chedule of [u]nderlying [i]nsurance and the applicable limits of any other underlying insurance providing coverage to the [plaintiff]; or 2. The amount stated in the [d]eclarations as [s]elf [i]nsured [r]etention as a result of any one [o]ccurrence not covered by the underlying policies listed in the [s]chedule of [u]nderlying [i]nsurance nor by any other underlying insurance providing coverage to the [plaintiff]; and then up to an amount not exceeding [e]ach [o]ccurrence [l]imit as stated in the [d]eclarations." (Emphasis added.) The schedule of underlying insurance attached to the policy lists the $1,000,000 insurance policy issued by Reliance, suggesting, at least implicitly, that damages in excess of that amount would be paid by the defendant regardless of what entity paid them. The phrase "total of the applicable limits" emphasizes a value, in this case $1,000,000, rather than a source of funds. The retained limit clause suggests no distinction between a payment made by the plaintiff's solvent insurer and a payment made to the injured party pursuant to an uninsured motorist policy.

Furthermore, the policy includes a section specifically intended to address the situation wherein the plaintiff or its primary insurer becomes insolvent. This section provides in its entirety: "[The plaintiff's] bankruptcy, insolvency or inability to pay or the bankruptcy, insolvency or inability to pay of any of [the plaintiff's] underlying insurers will not relieve [the defendant] from the payment of any claim covered by this policy. But under no circumstances will such bankruptcy, insolvency or inability to pay require [the defendant] to drop down and replace the [r]etained [l]imit or assume any obligation within the [r]etained [l]imit area." No specific provision addresses the situation in the present case,

wherein the plaintiff's primary insurer was insolvent, but Mennillo received compensation for a portion of his injuries via his personal uninsured motorist coverage. Thus, read in its entirety, the policy is ambiguous as to the precise nature and source of payments that count toward the retained limit. Accordingly, the defendant's construction of the coverage clause as counting toward the retained limit of only those funds that the *plaintiff itself* actually paid is overly broad and unjustified in light of the entire policy, which we conclude is ambiguous and, therefore, we must construe in favor of the insured. See, e.g., *Springdale Donuts, Inc.* v. *Aetna Casualty & Surety Co. of Illinois*, 247 Conn. 801, 806, 724 A.2d 1117 (1999) ("any ambiguity in the terms of an insurance policy must be construed in favor of the insured because the insurance company drafted the policy" [internal quotation marks omitted]).

Moreover, important public policy concerns surrounding the nature of uninsured motorist coverage militate in favor of the plaintiff's proffered construction of the coverage clause. We must, therefore, construe the ambiguous term consistently with public policy. Accordingly, we turn next to our previous decisions regarding the purpose and nature of uninsured motorist coverage.

Our decisions in *Haynes* v. *Yale-New Haven Hospital*, 243 Conn. 17, 25, 699 A.2d 964 (1997), and *Collins* v. *Colonial Penn Ins. Co.*, 257 Conn. 718, 734 and n.16, 778 A.2d 899 (2001), support the construction of uninsured motorist payments as payments that the tortfeasor was legally obligated to pay for the purpose of determining whether the retained limit of the tortfeasor's excess insurance policy has been met. In *Haynes*, we addressed the issue of whether a plaintiff who had been fully compensated for her decedent's injuries by her

decedent's own underinsured[8] motorist coverage could pursue a tort claim against the defendant hospital who had malpractice insurance. *Haynes* v. *Yale-New Haven Hospital*, supra, 22–24. Specifically, we addressed the issue of whether "underinsured motorist benefits, because of their contractual nature, are not within the ambit of the common-law rule precluding double recovery for the same harm, but, rather, come within the common-law collateral source rule."[9] Id., 22.

In concluding that uninsured motorist recoveries were, for the purposes of the common-law collateral source rule, properly treated as payments for the benefit of the tortfeasor, and not as a collateral recovery, we addressed at length the complex nature of uninsured motorist coverage, stating: "Although in form first party insurance, underinsured motorist insurance operates in part as a surrogate for a third party who lacks sufficient liability insurance. It provides benefits only upon proof that a third party, namely, an underinsured motorist for whose liability it acts as a surrogate, was a tortfeasor who injured the insured. Moreover, the amount of an underinsured motorist payment is determined, within contractual limits, by the measure of tort damages. . . .

"Thus, underinsured motorist benefits, although contractual in nature, operate in part as a liability insurance surrogate for the underinsured motorist third party tort-

---

[8] In *Haynes*, we noted that "all references to underinsured motorist coverage encompass[ed] uninsured motorist coverage as well," and we used the two terms interchangeably. (Internal quotation marks omitted.) *Haynes* v. *Yale-New Haven Hospital*, supra, 243 Conn. 21 n.4.

[9] "The collateral source rule provides that a defendant is not entitled to be relieved from paying any part of the compensation due for injuries proximately resulting from his act where payment [for such injuries or damages] comes from a collateral source, wholly independent of him. . . . The basis of [this] rule is that a wrongdoer shall not benefit from a windfall from an outside source. That rule is applicable . . . in any tort case." (Internal quotation marks omitted.) *Haynes* v. *Yale-New Haven Hospital*, supra, 243 Conn. 22–23 n.7.

feasor. We recognize that an underinsured motorist carrier is not the alter ego of the tortfeasor and . . . they do not share the same legal [status]. . . . The fact that the carrier and the tortfeasor do not share a complete legal identity, and thus are not in privity with each other, does not automatically resolve the narrower question of how payments made pursuant to an underinsured motorist policy should be treated.

"We do not mean to imply that claims for underinsured motorist payments must be viewed solely as sounding in tort, and not in contract. Neither classification is appropriate for all cases. Because underinsured motorist claims are sui generis, we need to go beyond labels in resolving the question posed by this case." (Citations omitted; internal quotation marks omitted.) Id., 25–26.

Subsequently, in *Collins* v. *Colonial Penn Ins. Co.*, supra, 257 Conn. 720–21, we addressed the issue of whether damages should be apportioned between a tortfeasor and an accident victim's uninsured motorist insurer, who was sued in the place of an unidentified cotortfeasor. In that case, we concluded that, despite the language of General Statutes § 52-572h (o), that "there shall be no apportionment of liability or damages between parties liable for negligence and parties liable on any basis other than negligence," the tortfeasor was entitled to have the judgment against him apportioned even though the uninsured motorist provider's liability was based in *contract* rather than in negligence. *Collins* v. *Colonial Penn Ins. Co.*, supra, 732. In quoting *Haynes*, we noted that, "underinsured motorist payments are not purely contractual in nature because such payments operate in part as a liability insurance surrogate for the underinsured motorist third party tortfeasor. . . . We recognized that underinsured motorist benefits are sui generis. They are contractual, but they depend on principles of tort liability and damages. Whether in any

particular case underinsured motorist benefits should be treated as are other types of insurance *must depend on a case-by-case analysis of the underlying purpose and the principles that apply to such benefits.*"[10] (Citations omitted; emphasis added; internal quotation marks omitted.) Id., 733.

Accordingly, when characterizing uninsured motorist coverage, we must consider the specific circumstances presented in each case, being mindful of "the dual purposes of underinsured benefits of providing compensation for the victims of underinsured motorists, while simultaneously adhering to the principle that uninsured motorist coverage is to place the insured in the same position as, but no better position than, the insured would have been had the underinsured tortfeasor been fully insured." (Internal quotation marks omitted.) Id., 734 n.16.

Under the principles articulated in *Haynes* and *Collins*, we conclude that the defendant is obligated to pay

[10] We note, however, that two other of our cases support the defendant's position in this appeal. In *Pecker* v. *Aetna Casualty & Surety Co.*, 171 Conn. 443, 451, 370 A.2d 1006 (1976), we concluded that, although insurers were permitted to "[provide] for reduction of [uninsured motorist insurance] limits . . . to the extent that damages have been . . . paid by or on behalf of any person responsible for the injury," payments made by a primary different uninsured motorist insurer *did not* constitute payments made "on behalf of the uninsured motorist responsible for the injury." (Internal quotation marks omitted.) Id. Rather, we concluded, uninsured motorist payments were more properly characterized as "payment on behalf of the [purchaser of the uninsured motorist policy], not the uninsured motorist." (Internal quotation marks omitted.) Id., 452.

Subsequently, in *Mazziotti* v. *Allstate Ins. Co.*, 240 Conn. 799, 800, 695 A.2d 1010 (1997), we addressed the issue of whether an uninsured motorist insurance provider was bound by a judgment obtained by its insured against the uninsured tortfeasor in a separate action under the doctrine of collateral estoppel. In that case, we concluded that the uninsured motorist provider was not bound by the prior judgment because it was not the "alter ego" of the tortfeasor. Id., 817. We conclude, however, that the specific facts of the present case render it more analogous to *Haynes* and *Collins* than to *Pecker* and *Mazziotti*.

all amounts over the retained limit of $1,000,000, toward which Mennillo's $600,000 uninsured motorist recovery shall be credited. The defendant acknowledges that, but for the insolvency of Reliance, it would have been obligated to pay any claim that exceeded the value of the Reliance policy. "The public policy established by the uninsured motorist statute is that every insured is entitled to recover for the damages he or she would have been able to recover if the uninsured motorist had [possessed a solvent] policy of liability insurance." (Internal quotation marks omitted.) *Rydingsword* v. *Liberty Mutual Ins. Co.*, 224 Conn. 8, 18, 615 A.2d 1032 (1992). Although the uninsured motorist statute clearly was intended for the benefit of Mennillo and not the plaintiff, who had no contractual relationship either with Mennillo or his uninsured motorist provider, we cannot ignore the reality that the $600,000 payment was made to fulfill what should have been Reliance's obligation.

Under its proposed reasoning, the defendant would accrue a $600,000 windfall simply by virtue of the insolvency of the plaintiff's insurer. Had Reliance been solvent, it would have paid, on the plaintiff's behalf, the first $1,000,000 of Mennillo's damages, thereby obviating the need for his uninsured motorist carrier to become involved. As previously discussed, it is well established that uninsured motorist benefits do not constitute a collateral source of injury compensation; see *Haynes* v. *Yale-New Haven Hospital*, supra, 243 Conn. 23–25; and that the parties' collective liability to Mennillo was reduced by the amount of his uninsured motorist compensation. If we were to adopt the defendant's position, it would have to pay $1,000,000 of Mennillo's $2,600,000 in damages, rather than the $1,600,000 it would have been required to pay had Reliance remained solvent. We are unable to conclude that the policy underlying uninsured motorist coverage is served by

such a windfall to the tortfeasor's umbrella insurer. Accordingly, under the circumstances of the present case, wherein the insurance policy is ambiguous and the public policy underlying uninsured motorist coverage dictates in favor of the plaintiff's position, we conclude that the $600,000 paid to Mennillo by his uninsured motorist carrier properly is applied toward the policy's retained limit.

The certified question is answered in the affirmative.

No costs will be taxed in this court to either party.

In this opinion the other justices concurred.