## STAMFORD WRECKING COMPANY *v.* UNITED STONE AMERICA, INC., ET AL.
### (AC 26572)

Flynn, C. J., and Harper and West, Js.

1

Argued April 28, 2006—officially released January 2, 2007

*Edward T. Lynch, Jr.*, with whom was *Julie M. Strzemienski*, for the appellants (named defendant et al.).

*Neal L. Moskow*, with whom, on the brief, was *Deborah M. Garskof*, for the appellee (plaintiff).

*Opinion*

HARPER, J. This appeal arises out of an action by the plaintiff, the Stamford Wrecking Company (Stamford Wrecking), against the defendants United Stone America, Inc. (United Stone), and Carlos A. Costa[1] to recover damages for failure to subcontract abatement and demolition work as promised. After trial, the jury returned a verdict in favor of the plaintiff with regard to its promissory estoppel and unjust enrichment claims. The trial court subsequently denied the defendants' motion to set aside the verdict and rendered judgment, awarding the plaintiff $455,000. On appeal, the defendants claim that (1) the court improperly excluded evidence on whether federal law prohibited them from awarding the promised amount of work, (2) the court improperly denied their motion to set aside the verdict, which was based in part on the plaintiff's ineligibility for equitable relief in quasi contract, and (3) there was insufficient evidence to support the verdict on unjust enrichment.[2] We affirm the judgment of the trial court.

The record reveals the following pertinent facts and procedural history. The plaintiff and United Stone are both contractors engaged in the construction business. In May, 2000, the United States Navy (Navy) sent out a solicitation for bids on a demolition project that was known as the Dolphin Gardens Demolition, located at the Navy submarine base in Groton (project). The solicitation specified, inter alia, that only general contractors that qualified as "small disadvantaged business concerns" under 13 C.F.R. § 124-(8) (a) ([8] [a] contractors)

[1] Costa is the president and founder of United Stone. The United States Navy, Northern Division, is also a defendant, but it has never actively participated in this litigation. Throughout this opinion, all references to the defendants will refer to United Stone and Costa.

[2] Because the defendants failed to explicate adequately their argument regarding the sufficiency of the evidence supporting the verdict on unjust enrichment, we decline to address it.

were eligible to submit bids for the project. United Stone was an (8) (a) contractor and was therefore eligible to serve as the general contractor on the project. The plaintiff did not qualify as an (8) (a) contractor and, consequently, was unable to bid directly on the project.

In early September, 2000, negotiations took place between the plaintiff and United Stone involving the possibility of submitting a collaborative bid for the project. On September 12, 2000, the presidents of both companies signed a short writing (subcontracting agreement) affirming that United Stone, if awarded the project, would "subcontract the abatement and demolition work to [the plaintiff] or its designee while retaining a certain portion of the work for its own forces pursuant to the Specifications." Although the subcontracting agreement did not specify the percentage of work allocation, both parties understood at the time of its execution that United Stone would perform 15 percent of the work on the project and subcontract the rest of the work to the plaintiff.[3] Further, at the time they signed the subcontracting agreement, both parties intended for the phrase "pursuant to the Specifications" to incorporate provisions from the contract between the Navy and United Stone.

On the same day that the parties executed the subcontracting agreement, United Stone formally submitted a bid for the project to the Navy. The cover letter accompanying the bid described the plaintiff as United Stone's subcontractor and stated that the proposed methodology for completing the project was "originally developed by Stamford Wrecking . . . ." Attached to the

---

[3] During the trial, Costa, the president of United Stone, testified that he believed when he signed the subcontracting agreement that United Stone would be responsible for performing only 15 percent of the work. Irving Goldblum, president of the plaintiff, also testified about his understanding that United Stone would perform 15 percent of the work on the project and subcontract the rest to the plaintiff.

bid were several exhibits. One exhibit described the qualifications of the plaintiff. Another exhibit was entitled "Abatement and Demolition Work Plan" and contained a breakdown of the proposed demolition and abatement subcontract work for the project. Included within this exhibit was a document stating that "[t]his work plan is based upon consolidated work efforts of [United Stone] as the general contractor, and [Stamford Wrecking] as the abatement and demolition subcontractor."

On December 15, 2000, the Navy sent United Stone a package containing an award letter and a signed copy of the construction contract (Dolphin Gardens contract). The Dolphin Gardens contract included a provision that required the general contractor, United Stone, to perform "work equivalent to at least [15] percent of the total amount of work to be performed under the contract."[4] Yet, the Dolphin Gardens contract also described the project as having a Standard Industrial Classification (SIC) code of 1795. Under the Small Business Administration's (SBA) classification system, the SIC code number 1795 applies to special trade contracts for which (8) (a) contractors are required to perform a minimum of 25 percent of the cost of the contract, not including the cost of materials, with its own employees. See 13 C.F.R. § 125.6 (4) (2006). Despite the contradictory provisions in the contract, on December 21, 2000, the defendants sent the Navy a letter confirming that United Stone would "self perform no less than 15% of the total Contract Value with [its] own forces and equipment."

On December 26, 2000, United Stone sent the plaintiff a letter announcing its receipt of the Dolphin Gardens

---

[4] The requirement that the general contractor perform at least 15 percent of the work applies to contracts classified as general construction contracts by the Small Business Administration (SBA). See 13 C.F.R. § 125.6 (3) (2006).

contract. The letter also stated that the September 12, 2000 subcontracting agreement had "lapsed," yet reassured the plaintiff that it would still be afforded "the opportunity to subcontract specific abatement and demolition work for the [p]roject as shown on bid documents." Further, the letter indicated that the opportunity for the plaintiff to serve as subcontractor was contingent on its submitting to United Stone an anticipated work schedule and breakdown of tasks by January 2, 2001.

The next day, December 27, 2000, the plaintiff sent United Stone further documentation regarding its expected performance of its duties as the project's subcontractor, along with a letter asserting that the subcontracting agreement was a binding contract that had not lapsed. After at least two telephone conversations between agents of the companies, United Stone informed the plaintiff via letter dated January 3, 2001, that, in its belief, the plaintiff had not complied satisfactorily with its information request and, consequently, would not serve as United Stone's subcontractor on the project.

On January 9, 2001, the plaintiff initiated the present action, alleging various contractual and equitable bases for requiring the defendants to award the plaintiff the project's abatement and demolition work pursuant to the subcontracting agreement. According to the plaintiff, the subcontracting agreement was a binding contract that obligated United Stone to subcontract to it "the abatement and demolition work," which constituted approximately 85 percent of the project's total work. As amended, the complaint alleged that the defendants' refusal to subcontract the agreed on amount of work to the plaintiff constituted a breach of contract or, alternatively, a ground for recovery on the basis of the equitable doctrines of promissory estoppel and unjust enrichment. The plaintiff further claimed that

the defendants' actions constituted a violation of the Connecticut Unfair Trade Practices Act (CUTPA),General Statutes § 42-110a et seq., and fraud.

When the action was initially submitted to the jury, the court declared a mistrial. Upon retrial, however, the jury returned a verdict in favor of the plaintiff on the promissory estoppel and unjust enrichment claims and a verdict in favor of the defendants on the breach of contract, fraud and CUTPA claims. After a hearing on May 4, 2005, the court denied the defendants' motion to set aside the verdict on the promissory estoppel and unjust enrichment claims. This appeal followed.

I

The defendants first argue that the court improperly excluded various documents and portions of federal regulations suggesting that the Navy incorrectly let the project out for bid as a "general construction" contract rather than a "special trade" contract. The defendants allege that this evidence would have refuted the plaintiff's breach of contract and promissory estoppel claims by showing that the federal laws and regulations applicable to special trade contracts prevented them from awarding the plaintiff 85 percent of the work on the project. Further, the defendants claim that the court should have admitted the evidence because the Dolphin Gardens contract's conflicting provisions regarding allocation of work created an ambiguity in the subcontracting agreement. We disagree.

The following additional facts are necessary for our review. At trial, the defendants offered a series of exhibits suggesting that the SBA had technically classified the Dolphin Gardens contract as a special trade contract. The proffered evidence included various federal regulations confirming that projects assigned an SIC code of 1795 are special trade contracts under which

(8) (a) contractors must perform at least 25 percent of the work.[5]

The defendants also sought to admit the deposition testimony of Kathleen J. Jennings, an SBA representative, and two sets of written correspondence between Jennings and the Navy. The first set consisted of two letters documenting the SBA's agreement to accept the project into the SBA's (8) (a) program and to assign it an SIC code of 1795. The second set of correspondence included two letters sent by Jennings after she learned of the project's classification as a general construction contract. On February 12, 2001, Jennings wrote to the defendants and instructed them to "keep in mind" that, as a special trade contractor under 13 C.F.R. § 125.6 (2006), they were required to perform at least 25 percent of the project work themselves. Jennings then sent a letter to a Navy representative notifying him of the conflicting work percentage requirements in the Dolphin Gardens contract and asking that the Dolphin Gardens contract be revised to correct them.

The court refused to admit the defendants' proffered evidence after finding that (1) the Dolphin Gardens contract explicitly stated, and the parties understood, that the project was a general construction contract and (2) although there were later discussions about whether to modify the Dolphin Gardens contract, actual modification never occurred. Therefore, the court concluded that any evidence offered to suggest that the project should have been classified as a special trade contract could not be admitted without violating the parol evidence rule.

Ordinarily, "the trial court may exercise its discretion with regard to evidentiary rulings, and the trial court's

---

[5] Specifically, the defendants sought to admit portions of 48 C.F.R. § 52.219-14 (2005) and 13 C.F.R. §§ 125.6 and 121.201 (2006). The defendants also proffered an exhibit containing the SBA's description of projects assigned an SIC code of 1795.

rulings will not be disturbed on appellate review absent abuse of that discretion." *Hall* v. *Burns*, 213 Conn. 446, 451, 569 A.2d 10 (1990). "Because the parol evidence rule is not an exclusionary rule of evidence, however, but a rule of substantive contract law . . . the [defendants'] claim involves a question of law to which we afford plenary review." (Internal quotation marks omitted.) *Alstom Power, Inc.* v. *Balcke-Durr, Inc.*, 269 Conn. 599, 609, 849 A.2d 804 (2004).

The parol evidence rule "is premised upon the idea that when the parties have deliberately put their engagements into writing, in such terms as import a legal obligation, without any uncertainty as to the object or extent of such engagement, it is conclusively presumed, that the whole engagement of the parties, and the extent and manner of their understanding, was reduced to writing. After this, to permit oral testimony, or prior or contemporaneous conversations, or circumstances, or usages . . . in order to learn what was intended, or to contradict what is written, would be dangerous and unjust in the extreme. . . .

"The parol evidence rule does not of itself, therefore, forbid the presentation of parol evidence, that is, evidence outside the four corners of the contract concerning matters governed by an integrated contract, but forbids only the use of such evidence to vary or contradict the terms of such a contract. Parol evidence offered solely to vary or contradict the written terms of an integrated contract . . . is inadmissible not because it is parol evidence, but because it is irrelevant. . . . [However] such evidence may still be admissible [in] situations [in which] the evidence (1) does not vary or contradict the contract's terms, or (2) may be considered because the contract has been shown not to be integrated; or (3) tends to show that the contract should be defeated or altered on the equitable ground that relief can be had against any deed or contract in writing

founded in mistake or fraud." (Internal quotation marks omitted.) *Schilberg Integrated Metals Corp.* v. *Continental Casualty Co.*, 263 Conn. 245, 277–78, 819 A.2d 773 (2003).

On appeal, the defendants claim that the evidence was admissible because the reference in the Dolphin Gardens contract to both general construction and special trade contracts created an ambiguity in the subcontracting agreement. Additionally, the defendants claim that the subcontracting agreement was ambiguous because the subcontracting agreement does not, on its face, specify the amount of work to be performed by each party.

"We construe a contract in accordance with what we conclude to be the understanding and intention of the parties as determined from the language used by them interpreted in the light of the situation of the parties and the circumstances connected with the transaction. . . . The intention of the parties manifested by their words and acts is essential to determine the meaning and terms of the contract and that intention may be gathered from all such permissible, pertinent facts and circumstances." (Internal quotation marks omitted.) *Poole* v. *Waterbury*, 266 Conn. 68, 97, 831 A.2d 211 (2003).

Furthermore, "[a] court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity . . . . Similarly, any ambiguity . . . must emanate from the language used in the contract rather than from one party's subjective perception of the terms. . . . Moreover, [t]he mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous. . . . If the language of the contract is susceptible to more than one reasonable interpretation, the contract is ambiguous." (Citations

omitted; internal quotation marks omitted.) *Goldberg* v. *Hartford Fire Ins. Co.*, 269 Conn. 550, 559, 849 A.2d 368 (2004).

Finally, "where the contract language is not definitive, the determination of the parties' intent is a question of fact, and the trial court's interpretation is subject to reversal on appeal only if it is clearly erroneous." *Cantonbury Heights Condominium Assn., Inc.* v. *Local Land Development, LLC*, 273 Conn. 724, 738, 873 A.2d 898 (2005).

Turning to the facts of this case, the agreement is silent regarding the precise amount of abatement and demolition work that was promised to the plaintiff and overall percentage of work that would be allocated to each party. Indeed, the agreement states, without further explication, only that United Stone "agrees to subcontract the abatement and demolition work to Stamford Wrecking while retaining a certain portion of the work for its own forces pursuant to the Specifications."

Given the agreement's lack of details, we conclude that the agreement was indeed ambiguous and that extrinsic evidence was therefore necessary to establish the intent of the parties at the time the agreement was executed. Accordingly, the court properly allowed both parties to present extrinsic evidence that tended to clarify the intended meaning of the agreement and particularly the intended allocation of work between the parties.

Despite the two different minimum performance standards in the Dolphin Gardens contract, the evidence conclusively established that the Navy, the plaintiff, and the defendants all believed that United Stone was required to perform only 15 percent of the work on the project. Notably, after receiving a signed copy of the Dolphin Gardens contract, United Stone wrote

to the Navy on December 21, 2000, to confirm its ability to perform the required minimum of 15 percent of the work. Indeed, there is no evidence that the Navy was even aware of the conflicting language in the Dolphin Gardens contract until Jennings brought it to the Navy's attention in a letter dated March 8, 2001.

Consequently, the fact that the Dolphin Gardens contract referred to special trade contracts did not alter the parties' understanding or intent regarding work allocation on the project. Because there never was any actual confusion regarding the parties' apportionment of the work on the project, the excluded evidence would not have been admissible to clarify the ambiguous language in the subcontracting agreement.

What the defendants' proffered evidence actually tended to show was that the project should have been classified as a special trade contract or perhaps was originally intended by the Navy and the SBA to be a special trade contract.[6] Indeed, that was the only fact the evidence could establish because there was never any question that the Navy understood that it had a general construction contract with the defendants.

Yet, as the court recognized, attempting to establish what the contract should have been, rather than what it was, is the exact conduct proscribed by the parol evidence rule. Our Supreme Court's decision in *HLO Land Ownership Associates Ltd. Partnership* v. *Hartford*, 248 Conn. 350, 727 A.2d 1260 (1999), is instructive in this regard. That case required interpretation of an ambiguous phrase used in a stipulated judgment. While acknowledging the admissibility of extrinsic evidence

---

[6] At oral argument, counsel for the defendants conceded this point when he stated that the proffered evidence should have been admissible "to show that in reality *it was supposed* to be a 25 percent contract." (Emphasis added.) Showing what a contract *was* supposed to have been, however, is precisely what the parol evidence rule forbids.

to interpret the meaning of the contractual phrase at issue, the court concluded that the excluded evidence actually tended to establish grounds for invalidating the contract altogether rather than clarifying its meaning. Id., 360.

Thus, in upholding the exclusion of the evidence, the court noted that it "would have gone beyond explaining the meaning of the phrase at issue [and] would have tended to show, instead, that the contract should be rescinded . . . ." Id. Because extrinsic evidence is admissible only to clarify the intended meaning of a contractual term, the court held that the proffered evidence "exceeded the proper scope of parol evidence" and was thus inadmissible. Id., 355.

Here, as in *HLO Land Ownership Associates Ltd. Partnership*, the proffered evidence surpassed the bounds of evidence that would have been admissible to clarify the alleged ambiguity in the agreement. Indeed, it would have enabled the defendants to bring in through the back door of ambiguity that which was totally barred admission by the parol evidence rule. This is especially so in this case because there was never any doubt that the parties originally intended to split the work in accordance with the percentages specified for general construction contracts.

In addition, although the parties did not raise the issue either before the trial court or this court, both the Navy and United Stone arguably waived their right to enforce the 25 percent requirement in the Dolphin Gardens contract by expressly confirming the correctness of the 15 percent provision. "Waiver is the voluntary relinquishment of a known right." (Internal quotation marks omitted.) *MacKay* v. *Aetna Life Ins. Co.*, 118 Conn. 538, 547, 173 A. 783 (1934). As noted by our Supreme Court, "[w]aiver does not have to be express, but may consist of acts or conduct from which

waiver may be implied. . . . In other words, waiver may be inferred from the circumstances if it is reasonable so to do." (Citation omitted; internal quotation marks omitted.) *Loda* v. *H. K. Sargeant & Associates, Inc.*, 188 Conn. 69, 76, 448 A.2d 812 (1982). Furthermore, the Navy and United Stone are presumed to have had actual or constructive knowledge of the 25 percent performance requirement in the Dolphin Gardens contract at the time of their confirmation of the 15 percent requirement. See *Batter Building Materials Co.* v. *Kirschner*, 142 Conn. 1, 7, 110 A.2d 464 (1954) (stating that a party is not allowed, "in the absence of accident, fraud, mistake or unfair dealing, to escape his contractual obligations by saying . . . that he did not read what was expressly incorporated as specific provisions of the contract into which he entered").

We conclude, therefore, that because the evidence offered by the defendants would have impermissibly varied or contradicted the terms of the agreement made by the parties, the court properly ruled that the defendants' proffered evidence warranted exclusion under the parol evidence rule.

## II

The defendants next claim that the court improperly denied their motion to set aside the verdict, which was based in part on the plaintiff's ineligibility for equitable relief in quasi contract. Specifically, the defendants allege that the agreement's failure to assign United Stone more than 15 percent of the work on the project would have violated 48 C.F.R. § 52.219-14 (2005) and 13 C.F.R. § 125.6 (2006).[7] On the basis of this presumption, the defendants contend that the parties' contract

[7] Title 13 of the Code of Federal Regulations, § 125.6 (a), provides in relevant part: "In order to be awarded a full or partial . . . 8 (a) contract . . . a small business concern must agree that . . . (3) In the case of a contract for general construction, the concern will perform at least 15 percent of the cost of the contract with its own employees (not including the costs of materials). (4) In the case of a contract for construction by special

was "illegal" and thereby rendered the promises underlying it "illegal" and "against public policy." Accordingly, the defendants claim that the verdict as to promissory estoppel and unjust enrichment must be set aside because neither doctrine "validate[s] a promise which is illegal." We disagree.

"The standard of review governing our review of a trial court's denial of a motion to set aside the verdict is well settled. The trial court possesses inherent power to set aside a jury verdict which, in the court's opinion, is against the law or the evidence. . . . [The trial court] should not set aside a verdict where it is apparent that there was some evidence upon which the jury might reasonably reach [its] conclusion, and should not refuse to set it aside where the manifest injustice of the verdict is so plain and palpable as clearly to denote that same mistake was made by the jury in the application of legal principles . . . . Ultimately, [t]he decision to set aside a verdict entails the exercise of a broad legal discretion . . . that, in the absence of clear abuse, we shall not disturb." (Internal quotation marks omitted.) *Medes* v. *Geico Corp.*, 97 Conn. App. 630, 638, 905 A.2d 1249, cert. denied, 280 Conn. 940, 912 A.2d 476 (2006).

---

trade contractors, the concern will perform at least 25 percent of the cost of the contract with its own employees (not including the costs of materials)."

Title 48 of the Code of Federal Regulations, § 52.219-14 (b), provides in relevant part: "By submission of an offer and execution of a contract, the Offeror/Contractor agrees that in performance of the contract in the case of a contract for . . . (3) General construction. The concern will perform at least 15 percent of the cost of the contract, not including the cost of materials, with its own employees. (4) Construction by special trade contractors. The concern will perform at least 25 percent of the cost of the contract, not including the cost of materials, with its own employees."

Because the Navy let the project out for bid as a general construction contract, the defendants, as the general contractor, were subject to the 15 percent requirement of 13 C.F.R. § 125.6 (2006) and 48 C.F.R. § 52.219-14 (2005). The defendants argue, however, that the Navy contract should have been a special trade contract for which they would have been required to perform 25 percent of the work under those regulations. As discussed previously, we find no merit to the defendants' claims regarding this issue.

"Although it is well established that parties are free to contract for whatever terms on which they may agree . . . it is equally well established that contracts that violate public policy are unenforceable. . . . [T]he question [of] whether a contract is against public policy is [a] question of law dependent on the circumstances of the particular case, over which an appellate court has unlimited review." (Citations omitted; internal quotation marks omitted.) *Hanks* v. *Powder Ridge Restaurant Corp.*, 276 Conn. 314, 326–27, 885 A.2d 734 (2005).

In this case, there is no support in the record for the defendants' contention that the subcontracting agreement's delegation of 85 percent of the work to the plaintiff would have violated any law, federal or state. As we have already discussed, the Navy let the project out for bid as a general construction contract.[8] The federal regulations applicable to general construction contracts, 13 C.F.R. § 125.6 (2006) and 48 C.F.R. § 52.219-14 (2005), require (8) (a) contractors to perform only 15 percent of the work. Because the subcontracting agreement reserved 15 percent of the work for United Stone, its enforcement would not have violated either of those federal regulations.

Having rejected the defendants' argument that performance under the subcontracting agreement would have violated § 125.6 or § 52.219-14, we fail to see any other means by which the subcontracting agreement could have constituted a violation of law or public policy. The

---

[8] The defendants suggest that the Navy was required by federal law to classify the project as a special trade contract, and the Navy's failure to categorize it as such was illegal. We do not reach this issue for the reasons explained previously in the analysis.

We note, however, that the defendants performed their responsibilities as general contractor in accordance with the Navy contract. As such, the defendants' argument that the Navy contract was illegal for *subcontracting* purposes is quite ironic.

subcontracting agreement contemplated subcontracting a stated percentage of work on a federal demolition project. That objective is not inherently illegal or contrary to any discernible public policy. Furthermore, a promise arising from such an agreement would be "in no sense one for or about any matter or thing which was prohibited or made unlawful." (Internal quotation marks omitted). *Sagal* v. *Fylar*, 89 Conn. 293, 296, 93 A. 1027 (1915).

Moreover, the defendants' allegations that the subcontracting agreement embodied an "illegal" contract or contract "against public policy" directly conflict with the jury's express findings of fact at trial. Specifically, the jury found there was no "valid, legally enforceable contract" between the plaintiff and defendant. In reaching that conclusion, the jury determined that "there was no meeting of the minds when the contract was made" and accordingly, "the defendant's failure to give the work to the plaintiff was excused because the parties never identified the fifteen percent (15 percent) of the cost of the work."

Second, and of particular import, is the jury's finding that the plaintiff did not intend to use United Stone as a "front" in violation of federal law. The jury also found that the defendants did not violate CUTPA or commit any fraudulent acts.

On the whole, then, the jury rejected all possible theories of wrongdoing or illegality in this case and instead found the contract void for lack of a "meeting of the minds." Given these express findings and the defendants' failure to demonstrate the subcontracting agreement contravened any cognizable public policy or law, we cannot conclude that the equitable remedies awarded were improper because of some illegal taint to the subcontracting agreement. The court, therefore,

did not commit any abuse of its discretion in denying the defendants' motion to set aside the jury verdict.

### III

Our conclusion that the agreement does not violate any law or public policy obviates the need to address the defendants' final argument that the judgment must be set aside because ex turpi causa non oritur actio— no cause of action may be founded on an immoral or illegal act. Here, the promises underlying the agreement were neither immoral nor illegal, and the jury's findings of promissory estoppel and unjust enrichment were well supported by the evidence.

The judgment is affirmed.

In this opinion the other judges concurred.