STEVEN SCHWARTZ *v.* FAMILY DENTAL
GROUP, P.C., ET AL.
(AC 27880)

DiPentima, McLachlan and Stoughton, Js.

Argued January 22—officially released April 8, 2008

*Barbara M. Schellenberg*, with whom was *Stuart M. Katz*, for the appellants (defendants).

*Edward Maum Sheehy*, with whom, on the brief, was *Suzannah K. Nigro*, for the appellee (plaintiff).

*Opinion*

McLACHLAN, J. The defendants, Family Dental Group, P.C., Peter Munk and Family Dental Group-Clinton Associates, appeal from the judgment of the trial court granting the application by the plaintiff, Steven Schwartz, for injunctive relief to restore his partnership status. The dispositive issues on appeal are whether § 12 (a) (i) in the partnership agreement is enforceable, and, if so, whether such provision permits termination of one of the partner's association with the partnership "without cause," as long as ninety days notice is given. We conclude that the provision is enforceable and that the language of the parties' contract is unambiguous and permits termination "without cause." Accordingly, we reverse the judgment of the trial court.

The following facts as found by the court are not disputed. On July 31, 1991, the plaintiff, Ken Epstein, Munk and Epstein's father, Gerald Epstein,[1] entered into a partnership agreement. All four were dentists by profession. Under the partnership agreement, they formed Family Dental Group-Clinton Associates, located at 468 Clinton Avenue in Bridgeport.

---

[1] Gerald Epstein is now deceased.

In its memorandum of decision, the court made the following factual findings. "Neither of the Epsteins practiced at this location at any time subsequent to the formation of the partnership. Initially the Epsteins held a 50 percent interest in the practice, while [the plaintiff] and Munk each held a 25 percent interest. Upon Gerald Epstein's death or retirement in 1995 or 1996, [the plaintiff] approached Munk about securing additional shares of the practice. An agreement was reached whereby the ownership interest was changed to one third each for Munk, [the plaintiff] and Ken Epstein.

"The final draft of the agreement contained the following pertinent terms: The partnership was to continue until the year 2051, unless the partners agreed to an early dissolution. The partners were looking to form an entity which would survive upon their death. The partners were to devote full professional time and attention to the partnership during the first five years of its inception. The two practicing partners, [the plaintiff] and Munk, were to receive 35 percent of their collections. Additionally, any profit beyond expenses would be put into a profit pool of which the first 20 percent would be divided equally between all three partners and the remaining, if any, would be divided equally between [the plaintiff] and Munk.

"From its formation until the present, the partnership has been successful, with increasing profits every year except in the year 2005. During the first five years, [the plaintiff] and Munk both maintained a full-time schedule. . . . In 1997, [the plaintiff] decided to reduce his workload, decreasing his hours on Wednesdays and Thursdays, and eliminating Fridays." Since the formation of the partnership, Munk maintained a consistent, full-time work schedule.

"Around 1997, when Munk became aware of [the plaintiff's] change in schedule, he became upset and

ceased communicating with [the plaintiff]. According to Munk's testimony, [the plaintiff] was also to blame for their breakdown in communication. Munk was dissatisfied with [the plaintiff's] management style, the way he conducted his practice, his refusal to accept [health maintenance organizations], take emergencies and work on Saturdays. He was also unhappy with [the plaintiff's] appearance, the condition of his work space, and the amount of vacation time he took. He expressed his dissatisfaction to Ken Epstein through letters he wrote to him over the course of several years; however, he did not approach [the plaintiff] directly with his concerns. Despite Munk's unhappiness with him, [the plaintiff] was able to function normally in the office and interact appropriately with the remaining staff. Ken Epstein often acted as the mediator between Munk and [the plaintiff].

"Munk was also dissatisfied with both his compensation and [the plaintiff's] refusal to expand the facilities. Munk wanted to change the agreement to alter his compensation or alternatively terminate [the plaintiff] as a partner. At a meeting held in 1999, a proposal was made to allocate the 20 percent of profit in proportion to the collections of the practicing partners. Alternatively, Munk suggested that he should receive a management fee for his managerial duties. [The plaintiff] did not accept either proposal and insisted that the parties submit to mediation pursuant to the agreement. The mediation resulted in an award of a management fee for Munk in the amount of two thirds of 1 percent of the gross revenue.

"On October 28, 2002, Epstein and Munk offered to buy out [the plaintiff's] shares of the practice, or alternatively, to keep him as a graduated partner while eliminating his management responsibilities and his share of the profits. Epstein and Munk sent [the plaintiff] an offer letter for a buyout, which [the plaintiff] refused. . . .

"On February 26, 2003, a special meeting of the partners was held. At the meeting, Ken Epstein and Munk voted to terminate [the plaintiff] from the practice." Munk and Epstein terminated the plaintiff's association with the partnership "without cause" and provided him with ninety days notice pursuant to § 12 (a) (i) in the partnership agreement. As a result of the termination, the plaintiff filed a ten count complaint against the defendants. At trial, the plaintiff pursued only the first count of the complaint, in which he sought equitable relief pursuant to General Statutes §§ 34-339[2] and 34-362 (b)[3] and restoration of his partnership status.[4]

[2] General Statutes § 34-339 provides: "(a) A partnership may maintain an action against a partner for a breach of the partnership agreement, or for the violation of a duty to the partnership, causing harm to the partnership.

"(b) A partner may maintain an action against the partnership or another partner for legal or equitable relief, with or without an accounting as to partnership business, to:

"(1) Enforce the partner's rights under the partnership agreement;

"(2) Enforce the partner's rights under sections 34-300 to 34-399, inclusive, including: (A) The partner's rights under section 34-335, 34-336 or 34-337; (B) the partner's right on dissociation to have the partner's interest in the partnership purchased pursuant to section 34-362 or enforce any other right under sections 34-355 to 34-357, inclusive, or sections 34-362 to 34-366, inclusive; or (C) the partner's right to compel a dissolution and winding up of the partnership business under section 34-372 or enforce any other right under sections 34-372 to 34-378, inclusive; or

"(3) Enforce the rights and otherwise protect the interests of the partner, including rights and interests arising independently of the partnership relationship.

"(c) The accrual of, and any time limitation on, a right of action for a remedy under this section is governed by other law. A right to an accounting upon a dissolution and winding up does not revive a claim barred by law."

[3] General Statutes § 34-362 (b) provides: "The buyout price of a dissociated partner's interest is the amount that would have been distributable to the dissociating partner under subsection (b) of section 34-378 if, on the date of dissociation, the assets of the partnership were sold at a price equal to the greater of the liquidation value or the value based on a sale of the entire business as a going concern without the dissociated partner and the partnership were wound up as of that date. Interest must be paid from the date of dissociation to the date of payment."

[4] The parties, prior to trial, entered into an agreement to withdraw the remaining nine claims. The parties later memorialized that agreement in a written stipulation agreement dated January 8, 2007.

The court granted the plaintiff's request for injunctive relief and enjoined the defendants from terminating his association with the partnership. The court found that "the partnership's termination date implie[d] that a reduction in workload was contemplated. Under § 1 of the agreement, the partnership will terminate on December 31, 2051, unless the parties agree to an extension in writing, or agree to terminate at an earlier time." The court concluded, stating that "this term in the contract implie[d] that there naturally would be a reduction in the number of hours a partner would devote to the practice over the years." The court did not find persuasive "the defendants' argument that § 12 (a) (i) of the agreement provides for termination without cause, as long as a ninety day notice is provided . . . ." Instead, the court found that "the provision, standing alone, is unenforceable. The court conclude[d] that no reasonable, educated person would sign an agreement whereby they could be stripped of their equitable interest in a business without a reasonable basis." The court also found that "§ 12 (a) (i) of the agreement does not clearly state a majority of the partners can terminate another partner without any reasonable basis. Therefore, it is the court's opinion that a reasonable basis for [the plaintiff's] termination must be provided." The court concluded that because the defendants did not provide a reasonable basis for the plaintiff's termination and the reasons provided by the defendants were not sufficient to strip him of his equitable interest in the practice, the plaintiff was entitled to injunctive relief. This appeal followed.

On appeal, the defendants claim that the court improperly found in favor of the plaintiff. Specifically, the defendants claim that the court improperly concluded that § 12 (a) (i) of the parties' partnership agreement (1) is unenforceable and (2) does not provide

that a majority of the parties can terminate another partner without cause.

"Although ordinarily the question of contract interpretation, being a question of the parties' intent, is a question of fact . . . [w]here there is definitive contract language, the determination of what the parties intended by their contractual communications is a question of law . . . . subject to plenary review by this court." (Citations omitted; internal quotation marks omitted.) *Tallmadge Bros., Inc.* v. *Iroquois Gas Transmission System, L.P.*, 252 Conn. 479, 495, 746 A.2d 1277 (2000). "In giving meaning to the terms of a contract, the court should construe the agreement as a whole, and its relevant provisions are to be considered together. . . . The contract must be construed to give effect to the intent of the contracting parties. . . . This intent must be determined from the language of the instrument and not from any intention either of the parties may have secretly entertained. . . . [I]ntent . . . is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract." (Internal quotation marks omitted.) *Phillips* v. *Phillips*, 101 Conn. App. 65, 74, 922 A.2d 1100 (2007). "[Where] . . . there is clear and definitive contract language, the scope and meaning of that language is not a question of fact but a question of law. . . . In such a situation our scope of review is plenary, and is not limited by the clearly erroneous standard." (Internal quotation marks omitted.) *Wolosoff* v. *Wolosoff*, 91 Conn. App. 374, 381, 880 A.2d 977 (2005). Whether a contract is ambiguous is a question of law subject to plenary review. See *Enviro Express, Inc.* v. *AIU Ins. Co.*, 279 Conn. 194, 200, 901 A.2d 666 (2006). Therefore, our review is plenary.

# I

The defendants first claim that the court improperly concluded that § 12 (a) (i) of the parties' partnership agreement is unenforceable.[5] The court concluded that § 12 (a) (i) is unenforceable because "no reasonable, educated person would sign an agreement whereby they could be stripped of their equitable interest in a business without a reasonable basis. Simply put, it is something a reasonably prudent person would not do." The defendants maintain that the court "ignores and contradicts well established Connecticut law" because Connecticut has a strong public policy favoring freedom of contract.[6]

There is a strong public policy in Connecticut favoring freedom of contract: "It is established well beyond the need for citation that parties are *free to contract for whatever terms on which they may agree.* This freedom includes the right to contract for the assumption of known or unknown hazards and risks that may arise as a consequence of the execution of the contract. Accordingly, in private disputes, a court

---

[5] Section 12 of the partnership agreement is entitled: "Other withdrawal from practice." Section 12 (a) (i) states: "In the event that any [p]artner's association with the [p]artnership is terminated for any reason other than death or total disability, *either party shall give the other not less than ninety (90) days written notice of such termination* and the [p]artnership shall have the first option to retire the interest of the departing [p]artner by paying the departing [p]artner deferred compensation at the '[f]ormula [a]mount.' " (Emphasis added.)

[6] In opposition, the plaintiff maintains that the defendants' claim must fail because it "unfairly dissects and magnifies one word, [unenforceable], out of a twelve page memorandum of decision. The trial court's memorandum of decision, when read in its entirety, sets forth . . . that the court properly found that the defendants could not strip the plaintiff of his partnership interests and income without a reasonable basis." In their reply brief, the defendants argue that the plaintiff "seeks to import ambiguity where there is none by arguing that despite the trial court's statement that § 12 (a) (i) of the agreement is 'unenforceable,' the court did not really mean it would not enforce this provision." The defendants assert that the plaintiff's argument is unpersuasive because the "term 'unenforceable' is a commonly understood term and requires no clarification."

must enforce the contract as drafted by the parties and may not relieve a contracting party from anticipated or actual difficulties undertaken pursuant to the contract, unless the contract is voidable on grounds such as mistake, fraud or unconscionability." (Emphasis added.) *Holly Hill Holdings* v. *Lowman*, 226 Conn. 748, 755–56, 628 A.2d 1298 (1993); see 1 Restatement (Second), Contracts §§ 154, 159 (1981); 2 Restatement (Second), Contracts § 208 (1981). If a contract violates public policy, this would be a ground to not enforce the contract.[7] *Stamford Wrecking Co.* v. *United Stone America, Inc.*, 99 Conn. App. 1, 16, 912 A.2d 1044, cert. denied, 281 Conn. 917, 917 A.2d 999 (2007). A contract, or in this instance, a partnership agreement, however, does not violate public policy just because the contract was made unwisely. *Tallmadge Bros., Inc.* v. *Iroquois Gas Transmission System, L.P.*, supra, 252 Conn. 505–506. "[C]ourts do not unmake bargains unwisely made. Absent other infirmities, bargains moved on calculated considerations, and whether provident or improvident, are entitled nevertheless to sanctions of the law. . . . Although parties might prefer to have the court decide the plain effect of their contract contrary to the agreement, *it is not within its power to make a new and different agreement; contracts voluntarily and fairly made should be held valid and enforced in the courts.*" (Emphasis in original.) Id. Moreover, our Supreme Court has opined: "A provision of a partnership agreement does not violate public policy simply because it is susceptible of an application that is advantageous to one partner and disadvantageous to

---

[7] "Although it is well established that parties are free to contract for whatever terms on which they may agree . . . it is equally well established that contracts that violate public policy are unenforceable. . . . [T]he question [of] whether a contract is against public policy is [a] question of law dependent on the circumstances of the particular case, over which an appellate court has unlimited review." (Internal quotation marks omitted.) *Stamford Wrecking Co.* v. *United Stone America, Inc.*, 99 Conn. App. 1, 16, 912 A.2d 1044, cert. denied, 281 Conn. 917, 917 A.2d 999 (2007).

another." *Konover Development Corp.* v. *Zeller*, 228 Conn. 206, 231, 635 A.2d 798 (1994).

In the present case, it is clear that the provision in § 12 (a) (i) does not violate public policy and is enforceable. This provision was entered into by sophisticated and highly educated professionals. Additionally, during the partnership agreement negotiations, both the plaintiff and Munk were represented by the same lawyer. Furthermore, § 34-362, under which the plaintiff sought relief, expressly contemplates that a partner may be "dissociated" from a partnership without resulting in a dissolution of the partnership.[8]

Moreover, this provision, which the defendants argue is an involuntary termination clause, does not favor one partner over another because the majority of the parties voted to terminate the plaintiff's association with the partnership. If the circumstances were different, the plaintiff would have been able to rely on the same provision to terminate one of the other partners. Thus, this provision is not against public policy just because in the present case it was a disadvantage to the plaintiff. See *Konover Development Corp.* v. *Zeller*, supra, 228 Conn. 231. Therefore, § 12 (a) (i) is enforceable.

## II

The defendants next claim that the court improperly concluded that § 12 (a) (i) of the parties' partnership agreement does not provide that a majority of the partners can terminate another partner without cause. The defendants maintain that, as the provision is written, the language refers to "termination resulting from any possible circumstance, excluding death or total disability, except as otherwise modified by another provision in the agreement." In opposition, the plaintiff argues that this provision is not a termination without cause

---

[8] See footnote 3.

provision; rather, it provides only the right of any partner to withdraw from the practice and voluntarily terminate his association in the event that a partner moved or relocated or for some other reason decided to terminate his association with the partnership.[9] We disagree with the plaintiff's assertion.

"A contract must be construed to effectuate the intent of the parties, which is determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. . . . [T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract. . . . Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms. A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity . . . . Similarly, any ambiguity in the contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms. (Internal quotation marks omitted.) *Tallmadge Bros., Inc.* v. *Iroquois Gas Transmission System, L.P.*, supra, 252 Conn. 498.

---

[9] The plaintiff maintains that the defendants' reading of § 12 (a) (i) as a termination without cause provision is "unreasonable under the totality of the terms of the agreement. The partners were interested in creating a partnership for a term of years, until 2051. . . . As shown by the provisions of the agreement, the parties intended to make this a long-term investment and did not intend in making this agreement to allow their other partners to be able to arbitrarily strip them of their interest in the partnership." (Citations omitted.) With this in mind, a reading of the partnership agreement as a whole, specifically, § 12, indicates that the parties made a termination without cause provision. The clear unambiguous language used does not permit a court to import ambiguity where there is none. *Tallmadge Bros., Inc.* v. *Iroquois Gas Transmission System, L.P.*, supra, 252 Conn. 498.

The defendants assert that the language in § 12 (a) (i) is clear and unambiguous and permits the partners to terminate another partner without cause.[10] Under § 12 (a) (i), "[i]n the event that any [p]artner's association with the [p]artnership is terminated for any reason other than death or total disability, *either party shall give the other not less than ninety (90) days written notice . . . .*" (Emphasis added.) The defendants argue that if the parties intended that § 12 (a) (i) would refer only to voluntary termination, they could have stated such intent. The defendants also refer to § 9 (a), which provides that "[a]ll decisions concerning the conduct of the [p]artnership business shall be made by a majority of the [p]artnership shares, except as otherwise expressly agreed to by the [p]artners."

The language of § 12 (a) (i), specifically, that *either party shall give the other* ninety days notice, clearly indicates that this provision does not simply apply to voluntary withdrawal. The term used in the provision, "either party," evidences the intent of the parties that this provision be a termination without cause provision.[11] Furthermore, § 12 (a) (i) coupled with § 9 (a)

[10] The defendants also assert that this provision makes sense in light of the other provision in the agreement, specifically, § 12 (e) of the agreement, which, as the defendants argue, is modified to allow for a termination for cause.

Section 12 (e) of the partnership agreement states as follows: "In the event that the termination hereunder is termination for cause, no prior notice shall be required and termination shall be considered immediate. Termination for cause shall be considered immediate. Termination for cause shall include, but not be limited to:

"(1) A [p]artner's loss of the right to practice dentistry;

"(2) A [p]artner's willful destruction of the [p]artnership property;

"(3) A [p]artner's conviction of a crime involving moral turpitude;

"(4) A [p]artner's breach of this [a]greement or otherwise engaging in conduct harmful to the business of the [p]artnership."

[11] The plaintiff argues that the intent of the parties should be taken from a reading of the partnership agreement in its entirety. With this in mind, a reading of the entire partnership agreement, particularly § 12, clearly evidences that § 12 (a) (i) contemplated termination of partners from the partnership without cause.

permits the very action taken by the defendants: the majority of shares acting to terminate a partner without cause. Most significantly, the plaintiff himself testified that § 12 (a) (i) permitted termination for reasons other than death, disability and termination for cause.[12] Thus, we conclude that the provision is enforceable[13] and that it permits the termination of the plaintiff's association with the partnership in the manner taken by the defendants. Accordingly, we disagree with the conclusion of the trial court.

The judgment of the trial court is reversed and the case is remanded for further proceedings in accordance with law.

In this opinion the other judges occurred.

---

[12] The following occurred when the plaintiff was cross-examined:

"Q. And if you go over to the next page [of the partnership agreement], there's § 12 (e). It says that 'in the event that the termination hereunder is termination for cause, no prior notice shall be required and termination shall be considered as immediate.' Did you see that?

"A. Yes.

"Q. Is it fair to say it's your understanding that if one of these cause events occurred no notice would need to be given and that someone would be terminated immediately?

"A. Correct.

"Q. Okay. And as for death and disability, § 11, which begins on page six, would seem to deal with what happens if someone dies or is disabled, right?

"A. Correct; okay.

"Q. Okay. So, that § 12 (a) is—which requires a ninety day written notice—

"A. Mum-humm.

"Q.—period would be limited to circumstances other than death, disability and termination for cause.

"A. Correct."

[13] Our Supreme Court recently enforced a contract provision that specifically permitted "without cause" termination of a physician from his health maintenance organization network of health care providers. The court found that "the trial court correctly determined that the defendant properly terminated the plaintiff's membership pursuant to the agreement's without cause provision. This provision is plain and unambiguous, and permits the defendant to terminate the agreement upon [ninety] days' written notice for *any reason* . . . ." (Internal quotation marks omitted.) *Ramirez* v. *Health Net of the Northeast, Inc.*, 285 Conn. 1, 14, 938 A.2d 578 (2008).