******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

## SMDV 1, LLC *v.* 459-461 PACIFIC STREET, LLC
(AC 47415)

Elgo, Suarez and DiPentima, Js.

*Syllabus*

The plaintiff appealed from the trial court's judgment for the defendants on its complaint alleging, inter alia, breach of contract related to the defendant P Co.'s purported termination of a contract for the sale and purchase of certain real property. The contract established a minimum purchase price for the property, which was subject to an upward adjustment based on a formula predicated, in part, on figures to be derived from the anticipated purchase and development of adjoining parcels of land that, at the time the contract was executed, were subject to a separate ground lease and purchase agreement between two other entities. The ground lease and purchase agreement was subsequently terminated, and P Co. then gave the plaintiff notice of termination of the contract, claiming that the purchase price of the property referenced in the contract was contingent on the consummation of the ground lease. On appeal, the plaintiff claimed that the court improperly considered parol evidence to ascertain the parties' intentions in making its determination that the contract was unenforceable. *Held*:

The trial court improperly used parol evidence to vary the terms of the contract when it determined that the contract was rendered unenforceable by the termination of the ground lease and purchase agreement, as the contract unambiguously established a minimum purchase price for the property, the plain language of the contract established that the closing on the property under the contract was independent of a closing on the ground lease and purchase, the contract included a merger clause, and the plaintiff and P Co. were both sophisticated commercial parties that had been represented by counsel.

Argued February 20—officially released July 8, 2025

*Procedural History*

Action to recover damages for, inter alia, breach of contract, and for other relief, brought to the Superior Court in the judicial district of Stamford-Norwalk, where Frank Steinegger was cited in as a defendant; thereafter, the named defendant filed a counterclaim; subsequently, the case was tried to the court, *Golger, J.*; judgment for the defendants on the complaint and for the plaintiff on the counterclaim, from which the

plaintiff appealed to this court. *Reversed; judgment directed in part; further proceedings.*

*Alexander J. Trembicki*, for the appellant (plaintiff).

*James H. Lee*, with whom, on the brief, was *Mark F. Katz*, for the appellees (defendants).

*Opinion*

DiPENTIMA, J. This appeal arises from an action brought by the plaintiff, SMDV 1, LLC, against the defendants, 459-461 Pacific Street, LLC (Pacific Street), and Frank Steinegger, related to Pacific Street's notice of termination of a contract for the sale and purchase of real property known as 459-461 Pacific Street in Stamford (property). The dispositive issue in this appeal is whether the trial court correctly determined that the contract was rendered unenforceable by the termination of a separate ground lease and purchase agreement between two different entities. After our review of the language of the contract, we conclude that the trial court's determination cannot stand. Accordingly, we reverse the judgment of the trial court rendered in favor of the defendants following a court trial and remand this case for further proceedings.

The following undisputed facts and procedural history are relevant to our resolution of this appeal. On June 30, 2020, the plaintiff and Pacific Street entered into a written contract pursuant to which the plaintiff was to purchase the property from Pacific Street (contract). Article 2 of the contract established a $1.7 million "minimum purchase price" for the property that was "subject to adjustment." The contract specified that the $1.7 million minimum purchase price could be increased by applying a mathematical formula that was predicated, in part, upon figures to be derived from the anticipated purchase and development of adjoining parcels of land that, at the time the contract was executed,

were subject to a December 31, 2012 "Ground Lease and Purchase Agreement" (ground lease) between Stamford Manhattan Development Ventures, LLC (Stamford Development or ground lessee), and several individual property owners who referred to themselves collectively as the Stamford Manhattan Transit Group (Stamford Transit or ground lessor).[1]

The contract refers to the ground lease generally, and it specifically identifies, by number, §§ 13.3 and 13.4 thereof.[2] It also includes another mathematical formula in article 2, by which an "[a]dditional [p]ayment" under the contract, by the buyer to the seller, might be made. That formula references, and is based upon, the payment of a "[l]ookback [a]djustment," under the ground lease, by the ground lease buyer to the ground lease seller. See footnote 2 of this opinion.

The contract also specifies that the property "and the properties which are the subject of the [g]round [l]ease are adjacent to each other and shall be regarded

---

[1] The parties to the contract and the parties to the ground lease are different entities. We note, however, that John McClutchy, Jr., the manager of the plaintiff who signed the contract on its behalf, was also the manager of JHM Development Group of Connecticut, LLC, which was the manager of Stamford Development. Likewise, the defendant Frank Steinegger, the sole member of the defendant Pacific Street who signed the contract on its behalf, was also one of the individual members who signed the ground lease as a member of Stamford Transit. The record reflects that McClutchy and Steinegger are both experienced real estate developers.

[2] Section 13.3 of the ground lease sets forth calculations by which to determine the "purchase price to be paid at the [c]losing" of the ground lease which are based upon percentages of its "Appraised Project Value." Section 13.3 also specifies that "in no event shall the [p]urchase [p]rice [for the ground lessor's estate be] less than [$14 million] . . . ."

Section 13.4 of the ground lease establishes a "[l]ookback [a]djustment" to the ground lease purchase price that is based upon the ground lease's "Total Project Value," and it provides a method by which to determine that value. The "[l]ookback [a]djustment" in the ground lease, when and if implicated, could have resulted in either (1) an additional payment by the ground lease buyer to the ground lease seller or (2) a refund from the ground lease seller to the ground lease buyer.

by each as two separate but contemporaneous closings." It further provides, in article 3, that "[t]he transfer of title to the [property] pursuant to this [contract] (the '**Closing**') shall occur on a date designated by [the plaintiff] upon not less than 10 days' prior written notice to [Pacific Street], which date shall not be later than 30 business days (or sooner at [the plaintiff's] option) following the date of the Closing under the [g]round [l]ease (the '**Closing Date**')." (Emphasis in original.) The contract does not state, however, that a closing of the ground lease was a condition precedent to the closing of the contract, nor did it explain what impact, if any, a failure to close on the ground lease would have on the viability of the contract and a closing thereunder.

The contract also includes a merger clause that expressly states that "[t]his [contract] embodies and constitutes the entire understanding between the parties with respect to the transactions contemplated herein, and all prior agreements, understandings, representations and statements, oral or written, are merged into this [contract]. Neither this [contract] nor any provision hereof may be waived, modified, amended, discharged or terminated except by an instrument signed by the party against whom the enforcement of such waiver, modification, amendment, discharge or termination is sought, and then only to the extent set forth in such instrument." Moreover, the contract further states that "[e]ach and every provision of this [contract] has been mutually negotiated, prepared and drafted, [and] each party has been represented by legal counsel . . . ."

On November 11, 2021, Stamford Transit terminated the ground lease due to Stamford Development's failure to pay rent. Four days later, on November 15, 2021, Pacific Street, through its attorney, Joseph Capalbo II, notified the plaintiff that it was terminating the contract. That written notice stated in relevant part:

"My client has recently been informed that the [ground lease] between [Stamford Transit] and [Stamford Development] has been terminated and is of no further force and effect. This event has a profound impact upon the [contract] between [Pacific Street] and [the plaintiff] dated June 30, 2020 . . . .

"In accordance with the terms of [a]rticle 2 of the [contract], the purchase price for the property referenced therein is predicated upon the sale of the property from [Stamford Transit] to [Stamford Development] in accordance with the [ground lease]. Specifically, the ultimate purchase price for the [property] referenced in the [contract] is based upon the 'Lookback Adjustment' as the same is defined, established and quantified in the [ground lease] (see Paragraph 2.1 (b) of the [contract]). Further the [contract] requires that each transaction be contemporaneous.

"For the foregoing reasons, [the plaintiff] will be unable to fulfill its contractual obligations . . . . As such, this shall constitute written notice of termination of the [contract]." The plaintiff responded through counsel, by stating that Pacific Street had no basis to terminate the contract and that its attempt to do so was not valid.

On December 17, 2021, the plaintiff commenced this action against Pacific Street. The initial complaint consisted of a single count that sought a declaration from the court that the "contract between the plaintiff . . . and . . . Pacific Street . . . dated June 30, 2020, remains in full force and effect . . . ."

On March 25, 2022, the plaintiff filed a motion to cite in Frank Steinegger as an additional defendant; see footnote 1 of this opinion; which the court, *Clark, J.,* granted. The plaintiff thereafter revised its complaint. In the revised complaint that sounded in three counts, the plaintiff again sought a declaration as to the validity

and enforceability of the contract and alleged slander of title and tortious interference with business expectancies against both defendants. Pacific Street filed a counterclaim on January 30, 2023, which alleged slander of title predicated on a lis pendens the plaintiff had placed on the property.

This case was tried to the court, *Golger, J.*, on August 8, 2023. The plaintiff presented testimony from one witness, John McClutchy, Jr., and introduced exhibits into evidence that included copies of the contract, the ground lease and Pacific Street's notice of termination. The defendants presented testimony from four witnesses, including Steinegger, and introduced exhibits that were admitted into evidence. McClutchy and Steinegger, both of whom testified to having extensive experience in the construction business,[3] offered conflicting testimony as to the intent behind the contract and its purported termination.

McClutchy testified that the contract had not been terminated because the plaintiff was "living by the terms of the agreement. There was nothing in the agreement that allowed anybody to unilaterally terminate it." Steinegger testified that he would not have entered the contract "if there was no second look provision . . . ." He explained that McClutchy had made several previous offers to purchase the property that he had rejected and that he accepted the $1.7 million offer only after deciding to "throw some skin in the game, I'll agree to the million seven but the bargain is . . . that we have the lookback provision as in the ground lease purchase agreement mirrored in the contract for a million seven." Moreover, as previously stated, Pacific Street's notice of termination asserted that "the ultimate purchase

---

[3] McClutchy testified that he had "been in the construction real estate business [his] entire life." Steinegger testified that he had "been in the construction business for forty-eight years . . . ."

price for the [property] referenced in the [contract] is based upon the 'Lookback Adjustment' " set forth in the ground lease.

In its posttrial brief, the plaintiff argued that "[i]t is clear from the unambiguous terms of the contract that the termination of the ground lease affects the amount of the consideration to be paid, <u>not</u> the existence of the contract." (Emphasis in original.) Moreover, the plaintiff emphasized the fact that the contract did not include a cross default provision "by which a default under the ground lease could trigger a default under" the contract. Conversely, the defendants argued, in their posttrial brief, that "[t]he plain language of [the contract] clearly and expressly states that the $1.7 million purchase price is contingent upon a lookback and upward adjustment, based upon the sale price of the real property under the [ground lease]." They maintained that "the closing of title under the contract . . . could not occur until the ground lease sale was scheduled" and that "the consummation of the ground lease was a 'condition precedent' " to the sale of the property to the plaintiff.

On January 23, 2024, the court issued a memorandum of decision rendering judgment in favor of the defendants on all counts of the complaint[4] after expressly finding "that the plaintiff's contract is not enforceable in the absence of a closing of the ground lease."[5] The

___

[4] The court also rendered judgment in favor of the plaintiff on Pacific Street's counterclaim. Pacific Street has not brought a cross appeal to challenge that judgment, and thus it has abandoned any claim it might have raised in this regard. See, e.g., *East Windsor* v. *East Windsor Housing, Ltd., LLC*, 150 Conn. App. 268, 270 n.1, 92 A.3d 955 (2014) ("[i]f an appellee wishes to change the judgment in any way, the party must file a cross appeal" (internal quotation marks omitted)).

[5] The court further determined that "[c]ounts two and three of the plaintiff's complaint are derivative of the first count of the plaintiff's complaint and cannot survive in the absence of a finding that an enforceable contract exists."

court did not, however, appear to agree with the defendants that the contract language unambiguously supported this conclusion. Rather, after acknowledging that "the parties disagree on what the plain meaning of the contract is as it concerns the material terms of the purchase price and closing date," the court deemed the contract "silent (or ambiguous) as to the rights of the parties if no closing of the ground lease occurs" and found "sufficient ambiguities that can only be explained by extrinsic evidence in the form [of] testimony from the parties." It found "that the failure of the parties to define their rights under the [contract] in the event that the ground lease did not close [was] significant" and, despite previously asserting that "article 2 [of the contract] makes the final price of [the property] dependent on a lookback provision in the ground lease," the court expressly credited "the testimony of [Steinegger] that the [contract] was contingent upon the closing of the ground lease because the lookback provision of the ground lease determined the sales price of [the property]." It further found that the contract and the ground lease "were inextricably intertwined in this transaction, as demonstrated by the fact that [Pacific Street] had already rejected offers to purchase [the property] from the plaintiff for $2 million and $3 million."

On February 5, 2024, the plaintiff filed a motion to reargue or for the court to reconsider the court's decision in which it argued that the court improperly considered extrinsic, or parol, evidence to reach its conclusion because the contract was unambiguous and because it included a merger clause. On February 20, 2024, the court denied the motion to reargue or reconsider, and this appeal followed. Additional facts and procedural history will be set forth as necessary.

On appeal, the plaintiff raises a single issue—that the court improperly considered parol evidence in concluding that the contract was unenforceable. In support of

this claim, the plaintiff argues that the court improperly considered parol evidence to ascertain the parties' intentions because (1) the contract unambiguously established a $1.7 million minimum purchase price for the property that was binding and enforceable irrespective of whether there was a closing of the ground lease and (2) the contract included a merger clause. As such, the plaintiff maintains that it was improper for the court to consider and credit parol evidence to vary the terms of the contract.[6]

In response, the defendants first and primarily argue, as an alternative ground of affirmance, that the contract unambiguously established that the termination of the ground lease rendered the contract unenforceable because the purchase price for the property could not be determined unless and until there was a closing on the ground lease properties.[7] They then, "for the sake of argument," assume that the court was correct in finding ambiguity to argue that it properly used parol evidence to resolve the ambiguity. We conclude that the court improperly used parol evidence to vary the terms of the contract, and we are not persuaded by the defendants' alternative ground to affirm.[8]

---

[6] We note that "[t]he parol evidence rule does not of itself . . . forbid the presentation of parol evidence, that is, evidence outside the four corners of the contract concerning matters governed by an integrated contract, but forbids only the use of such evidence to vary or contradict the terms of such a contract." (Internal quotation marks omitted.) *Stamford Wrecking Co.* v. *United Stone America, Inc.*, 99 Conn. App. 1, 9, 912 A.2d 1044, cert. denied, 281 Conn. 917, 917 A.2d 999 (2007). There is no claim in this appeal that parol evidence was improperly admitted at trial.

[7] The defendants posit in their brief that "[t]his argument is both [their] response to the plaintiff's claim and the subject of [their] alternat[ive] ground for affirmance."

[8] The plaintiff did not challenge the propriety of the trial court's factual findings in its opening brief to this court. It solely focused, instead, on its claim that the court should not have considered parol evidence at all. Although the defendants claim in their brief to this court that the contract unambiguously supports the judgment the court rendered in their favor, they also argue that, if the contract was ambiguous, the court properly resolved those ambiguities by relying on parol evidence. In doing so, how-

We begin our discussion by setting forth the relevant legal principles, including our standard of review. "[If] a party asserts a claim that challenges the trial court's construction of a contract, we must first ascertain whether the relevant language in the agreement is ambiguous. . . . If a contract is unambiguous within its four corners, intent of the parties is a question of law requiring plenary review. . . . [If] the language of a contract is ambiguous, the determination of the parties' intent is a question of fact, and the trial court's interpretation is subject to reversal on appeal only if it is clearly erroneous. . . . A contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself. . . . Accordingly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms. . . .

"[W]e accord the language employed in the contract a rational construction based on its common, natural

ever, the defendants merely recite the court's findings and point out that "[h]aving placed its entire wager on the proposition that it should prevail as a matter of law, the plaintiff did not challenge the trial court's fact-finding" without explaining how that fact-finding is correct. See *U.S. Bank Trust, National Assn.* v. *Shuey*, 232 Conn. App. 618, 620 n.2,       A.3d (2025) ("We are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly." (Internal quotation marks omitted.)).

In its reply brief to this court, the plaintiff maintains its claim that the trial court should not have considered parol evidence to construe the contract but also argues, in response to the defendants' observation, that the factual findings the court made upon doing so were clearly erroneous. Likewise, at oral argument before this court, when questioned as to whether the plaintiff was "challenging any facts found," the plaintiff's counsel responded by stating that "if you get into the question of whether the parol evidence should have been allowed or not . . . Judge Golger made a call [and] I think he ignored some of the evidence that came out in the testimony from my client as well as [Copalbo] . . . ." Because we conclude that the contract is unambiguous and that the court should not have considered parol evidence at all, we need not address the procedural and substantive propriety of the parties' claims regarding the nature of the court's factual findings.

and ordinary meaning and usage as applied to the subject matter of the contract. . . . [If] the language is unambiguous, we must give the contract effect according to its terms. . . . [If] the language is ambiguous, however, we must construe those ambiguities against the drafter. . . . Moreover, in construing contracts, we give effect to all the language included therein, as the law of contract interpretation . . . militates against interpreting a contract in a way that renders a provision superfluous. . . .

"In ascertaining the intent of contracting parties, we are also mindful that a court's interpretation of a contract must also be informed by whether the terms of the contract are contained in a fully integrated writing. This is important because [t]he parol evidence rule prohibits the use of extrinsic evidence to vary or contradict the terms of an integrated written contract. . . . The parol evidence rule does not apply, however, if the written contract is not completely integrated. . . .

"An integrated contract is one that the parties have reduced to written form and which represents the full and final statement of the agreement between the parties. . . . Accordingly, an integrated contract must be interpreted solely according to the terms contained therein. Whether a contract is deemed integrated oftentimes will turn on whether a merger clause exists in the contract. . . . The presence of a merger clause in a written agreement establishes conclusive proof of the parties' intent to create a completely integrated contract and, unless there was unequal bargaining power between the parties, the use of extrinsic evidence in construing the contract is prohibited. . . .

"We long have held that when the parties have deliberately put their engagements into writing, in such terms as import a legal obligation, *without any uncertainty as to the object or extent of such engagement,*

it is conclusively presumed, that the whole engagement of the parties, and the extent and manner of their understanding, was reduced to writing. After this, to permit oral testimony, or prior or contemporaneous conversations, or circumstances, or usages [etc.], in order to learn what was intended, or to contradict what is written, would be dangerous and unjust in the extreme. . . . Although there are exceptions to this rule, we continue to adhere to the general principle that the unambiguous terms of a written contract containing a merger clause may not be varied or contradicted by extrinsic evidence. . . . Courts must always be mindful that parties are entitled to the benefit of their bargain, and the mere fact it turns out to have been a bad bargain for one of the parties does not justify, through artful interpretation, changing the clear meaning of the parties' words." (Emphasis in original; footnote omitted; internal quotation marks omitted.) *Johnson* v. *Vita Built, LLC*, 217 Conn. App. 71, 84–86, 287 A.3d 197 (2022); see also 2 Restatement (Second), Contracts § 204, comment (e), p. 98 (1981) ("[if] there is complete integration and interpretation of the writing discloses a failure to agree on an essential term, evidence of prior negotiations or agreements is not admissible to supply the omitted term").

Indeed, "[t]he court will not torture words to impart ambiguity where ordinary meaning leaves no room for ambiguity. . . . Moreover, the mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous. . . . Furthermore, a presumption that the language used is definitive arises when, as in the present case, the contract at issue is between sophisticated parties and is commercial in nature." (Citations omitted; internal quotation marks omitted.) *United Illuminating Co.* v. *Wisvest-Connecticut, LLC*,

259 Conn. 665, 670, 791 A.2d 546 (2002). "[T]he determination as to whether contractual language is plain and unambiguous is . . . a question of law subject to plenary review." *Cruz* v. *Visual Perceptions, LLC*, 311 Conn. 93, 101–102, 84 A.3d 828 (2014).

"In Connecticut, the essential terms of a contract for the sale of real property include the parties, a description of the subject of the sale, and the terms of payment, including a basis for determining the total purchase price . . . ." *Bayer* v. *Showmotion, Inc.*, 292 Conn. 381, 412–13, 973 A.2d 1229 (2009). The parties here dispute whether the contract unambiguously establishes an enforceable purchase price for the property that can be ascertained independently from the ground lease and a closing thereon. The defendants argue that the purchase price of the property cannot be calculated in the absence of a purchase of, and closing on, the ground lease properties and, thus, "without a closing under the ground lease, there can be no closing under the [contract]." The plaintiff argues that the contract unambiguously establishes the purchase price of the property and that the termination of the ground lease simply precluded the possibility of securing additional consideration above that established amount.

The text of article 2, § 2.1, of the contract plainly states that "[t]he purchase price . . . to be paid by [the plaintiff] to [Pacific Street] for the [property] is **ONE MILLION SEVEN HUNDRED THOUSAND AND 00/ 100 ($1,700,000.00) DOLLARS** (the '**Premises Minimum Price**'), subject to adjustment . . . ." (Emphasis in original.) Section 2.1 (b) reiterates, after making reference to §§ 13.3 and 13.4 of the ground lease, that "the purchase price of One Million Seven Hundred Thousand ($1,700,000.00) shall be the minimum purchase price" for the property, which is "subject to increase . . . based upon the increase, if any, over Fourteen Million ($14,000,000.00) Dollars (the '**Ground Lease Minimum**

**Price**') in the initial 'Purchase Price' " set forth in the ground lease.[9] (Emphasis in original.) Section 2.1 further provides that the "minimum purchase price of $1,700,000.00 shall be adjusted upward" based upon a mathematical calculation that uses the actual purchase price paid at the anticipated ground lease closing and the ground lease minimum price to determine the "actual [p]urchase [p]rice" for the property.[10]

As such, the contract clearly, repeatedly and without qualification establishes that the *minimum purchase price* for the property is $1.7 million. Moreover, although the contract provides that the $1.7 million minimum purchase price might have been adjusted upward, or increased, if there had been a closing of the ground lease, such an adjustment was neither required nor guaranteed. Indeed, the minimum purchase price was only "*subject to*" being adjusted, and "the increase, *if any,*" would have been dependent upon the ground lease closing *for more than* the ground lease minimum price of $14 million. (Emphasis added.) By the contract's plain terms, if the ground lease closed at the $14 million ground lease minimum price, there would be no upward adjustment and, thus, no impact on the established minimum purchase price for the plaintiff's purchase of the property.[11]

---

[9] We note that, "[g]enerally, incorporation by reference of existing documents produces a single contract which includes the contents of the incorporated papers." (Internal quotation marks omitted.) *Morales* v. *PenTec, Inc.*, 57 Conn. App. 419, 438, 749 A.2d 47 (2000).

[10] The contract specifically provides: "The minimum purchase price of [$1.7 million] shall be adjusted upward by creating a fraction, the numerator of which shall be the actual [p]urchase [p]rice payable by the [g]round [l]essee at the [c]losing under the [g]round [l]ease for the [g]round [l]ease [p]remises, and the denominator of which shall be the [g]round [l]ease [m]inimum [p]rice. This fraction shall then be multiplied against the [property's] [m]inimum [p]rice to determine the actual [p]urchase [p]rice."

[11] Indeed, the application of the formula set forth in § 2.1 (b) of the contract for the purchase price adjustment and restated in footnote 10 of this opinion further bears this out. If the actual price paid under the ground lease was $14 million, $14 million would be the fraction's numerator and denominator and the fraction would be equivalent to the whole number one. When the

The defendants' interpretation of the contract does not follow from this clear and unambiguous language. Instead, the defendants treat the "upwardly adjusted purchase price" as a guarantee and argue that the $1.7 million minimum purchase price for the property cannot be the "whole price . . . because the 'upward adjustment' . . . is not trivial." The defendants maintain that, "if there was no purchase of the ground lease properties, the purchase price of this property [cannot] be computed."[12]

Although we agree with the defendants that any *increase* to the $1.7 million minimum purchase price could not be computed without a closing of the ground lease, the fact remains that the $1.7 million minimum purchase price itself is clearly stated and it is definitive. As we previously have stated, the terms of the contract did not require or guarantee that there would be an upward adjustment to the minimum purchase price at all, even if the ground lease were to close. The contract neither limited the applicability of the $1.7 million minimum purchase price in any way nor stated that it was only effective and enforceable if the ground lease closed. We decline to tether the viability of that expressly stated minimum purchase price to a closing of the ground lease in the absence of any express language in the contract that would support our doing so.

number one is then multiplied by the $1.7 million minimum purchase price as the formula requires, the "actual [p]urchase [p]rice" for the property would be $1.7 million.

[12] We note that the defendants' sole argument on appeal with respect to the purchase price is that it is contingent on an upward adjustment that could not be calculated unless there was a closing of the ground lease. The defendants do not argue, as they did before the trial court, that the purchase price is also predicated on the lookback adjustment in the ground lease, which is the conclusion the court reached after it credited Steinegger's testimony. As such, we deem any such claim abandoned. See *JPMorgan Chase Bank, National Assn.* v. *Essaghof*, 221 Conn. App. 475, 485, 302 A.3d 339 ("claims of error not briefed are considered abandoned" (internal quotation marks omitted)), cert. denied, 348 Conn. 923, 304 A.3d 445 (2023).

"[A] court cannot import into the agreement a different provision nor can the construction of the agreement be changed to vary the express limitations of its terms." (Internal quotation marks omitted.) *Konover* v. *Kolakowski*, 186 Conn. App. 706, 718, 200 A.3d 1177 (2018), cert. denied, 330 Conn. 970, 200 A.3d 1151 (2019).

Likewise, we do not agree with the defendants' contention that the closing date set forth in the contract "is expressed by reference to the closing of title pursuant to the ground lease" such that the termination of the ground lease means that "there can be no closing under the [contract]." In fact, the contract provides that "[t]he transfer of title to the [property] pursuant to this [contract] (the '**Closing**') shall occur on a date designated by [the plaintiff] upon not less than 10 days' prior written notice to [Pacific Street]," and then, in a separate clause following a comma, "which date shall not be later than [thirty] business days (or sooner at [the plaintiff's] option) following the date of the Closing under the [g]round [l]ease (the '**Closing Date**')." (Emphasis in original.) Moreover, the contract refers to the closing on the property and the closing on the ground lease as "two separate but contemporaneous closings." The contract does not, however, state that the closing of the contract is contingent or dependent upon a closing of the ground lease. As such, the plain language of the contract establishes that the closing on the property under the contract is independent of a closing of the ground lease, and that it can occur on a date designated by the buyer, as long as the seller has been given proper notice thereof. Moreover, it provides that, if there was a closing of the ground lease that preceded a closing under the contract, the closing of the property under the contract could not be scheduled more than thirty days afterward.

If the parties had agreed to make the closing of the contract contingent upon the closing of the ground

lease, the contract should have said so. It did not. "We will not insert limitations into a contract when the parties did not do so themselves. . . . This is especially so when, as here, the agreement is between sophisticated commercial parties represented by counsel. . . . In these circumstances, we presume the parties used definitive language to describe their agreement." (Citations omitted.) *Salce* v. *Wolczek*, 314 Conn. 675, 690–91, 104 A.3d 694 (2014). "[W]e must discern the parties' intent, in the first instance, from the language they used and not the language we think they might have chosen if confronted with this particular issue." Id., 695. In this case, the sophisticated commercial parties chose language that unambiguously established a minimum purchase price for the property that might well have been impacted by, but was not contingent upon, the closing of the ground lease.

Even so, the court found the contract was "silent (or ambiguous) as to the rights of the parties if no closing of the ground lease occur[red]," and it deemed the parties' "failure" to define their rights in this regard "significant." "[I]t is generally true [however] that silence alone does not necessarily equate to ambiguity"; *Centerplan Construction Co.*, *LLC* v. *Hartford*, 343 Conn. 368, 410, 274 A.3d 51 (2022); and, although the contract does not expressly state that the contract is valid and enforceable regardless of whether a closing of the ground lease occurs, as we have explained previously, the plain language of the contract makes this clear. See *Johnson* v. *Vita Built*, *LLC*, supra, 217 Conn. App. 84–86.

Moreover, as the plaintiff points out, "the contract does not contain a cross default provision by which a default under the ground lease could trigger a default under the [contract]." It does, however, include a merger clause that expressly states that "[t]his [contract] embodies and constitutes the entire understanding between the parties with respect to the transactions

contemplated herein, and all prior agreements, understandings, representations and statements, oral or written, are merged into this [contract]. Neither this [contract] nor any provision hereof may be waived, modified, amended, discharged or terminated except by an instrument signed by the party against whom the enforcement of such waiver, modification, amendment, discharge or termination is sought, and then only to the extent set forth in such instrument." This is significant because, as this court has noted, "[i]n the case of a fully integrated contract, usually manifested by its inclusion of a merger clause, the parties are deemed to have agreed that the terms of their written contract supersede all prior and contemporaneous communications between them. Under such circumstances, a court may not add additional terms to the contract." *Lux* v. *Environmental Warranty, Inc.*, 59 Conn. App. 26, 33 n.8, 755 A.2d 936, cert. denied, 254 Conn. 949, 762 A.2d 902 (2000).

"In sum, we view this case as an opportunity to reaffirm the wisdom of our [Supreme Court's] earlier admonition that [c]ourts do not unmake bargains unwisely made. Absent other infirmities, bargains moved on calculated considerations, and whether provident or improvident, are entitled nevertheless to sanctions of the law. . . . Although parties might prefer to have the court decide the plain effect of their contract contrary to the agreement, *it is not within its power to make a new and different agreement; contracts voluntarily and fairly made should be held valid and enforced in the courts.* . . . The parties in this case entered into [a] sophisticated and carefully crafted commercial [contract] from positions of relative equality, without the improper influence of fraud or duress. Even if the result of the fair and logical enforcement of [the] unambiguous [contract] seems unduly to burden one of the parties, we decline to embark a voyage into uncharted waters

in which untrammeled and unrestrained judicial revisionism would depart significantly from an aspect of contract law upon which contracting parties reasonably can be assumed to have relied for many years." (Citation omitted; emphasis in original; internal quotation marks omitted.) *Tallmadge Bros., Inc.* v. *Iroquois Gas Transmission System, L.P.*, 252 Conn. 479, 505–506, 746 A.2d 1277 (2000).

The judgment is reversed and the case is remanded with direction to declare the contract valid and enforceable and to render judgment for the plaintiff with respect to count one of the revised complaint and for further proceedings with respect to counts two and three of the revised complaint.

In this opinion the other judges concurred.